David Mara, Esq. (SBN 230498)
Jill Vecchi, Esq. (SBN 299333)
**MARA LAW FIRM PC**
2650 Camino Del Rio North Suite 302
San Diego, California 92108
Telephone: (619) 234-2833
Facsimile: (619) 234-4048
Email: dmara@maralawfirm.com
          jvecchi@maralawfirm.com

Hunter Pyle, Esq. (SBN 191225)
Andrea A. Núñez, Esq. (SBN 340062)
**HUNTER PYLE LAW, PC**
505 14th Street, Suite 600
Oakland, California 94612
Telephone (510) 444-4400
Facsimile: (510) 444-4410
Email:     hunter@hunterpylelaw.com
           anunez@hunterpylelaw.com

Attorneys for the Class

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DENSON M. SALES; ANDRE CLEMONS; ROBERT BEJAR; and MARTIN CHAVEZ on behalf of themselves, all others similarly situated, and on behalf of the general public,<br><br>        Plaintiff,<br><br>v.<br><br>UNITED ROAD SERVICES, INC.; URS MIDWEST, INC. and DOES 1-100, inclusive,<br><br>        Defendants. | Case No.  4:19-cv-08404-JST<br><br>[*Assigned to the Honorable Jon S. Tigar; Department 6*]<br><br>**PLAINTIFFS ROBERT BEJAR AND MARTIN CHAVEZ'S NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF CLASS ACTION AND PAGA SETTLEMENT**<br><br>Date: March 7, 2024<br>Time: 2:00 p.m.<br><br>**Complaint Filed:** November 18, 2019<br>**SAC Filed:** May 18, 2023<br>**Trial Date:** May 20, 2024 |

**TO: ALL PARTIES HEREIN AND TO THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that Plaintiffs Robert Bejar and Martin Chavez move this Court for an order: (1) confirming certification of the Class for settlement purposes only; (2) finally approving the settlement embodied in the Joint Stipulation of Settlement and Release of Class Action Claims; (3) confirming Phoenix Settlement Administrators as the Settlement Administrator and granting the requested fee for its services as Settlement Administrator; (4) finally approving the Private Attorneys General Act of 2004 Payment; and (5) entering judgment.

This motion is set for determination on March 7, 2024, at 2:00 p.m. in Courtroom No. 6 (2nd Floor) in the above-entitled courthouse located at 1301 Clay Street, Oakland, California 94612. This motion is based upon this notice, the accompanying Memorandum of Points & Authorities filed herewith, the accompanying Declaration of David Mara, Esq., filed herewith, the Joint Stipulation of Settlement and Release of Class Action Claims and all exhibits thereto, the Order Granting Preliminary Approval, the filings on record in this case, and upon such further evidence, both documentary and oral, that may be presented at the hearing of this motion.

Dated: February 8, 2024          **MARA LAW FIRM, PC**
                                          */s/ David Mara*
                                          David Mara, Esq.
                                          Jill Vecchi, Esq.
                                          Representing the Class

Dated: February 8, 2024          **HUNTER PYLE LAW**
                                          */s/ Hunter Pyle*
                                          Hunter Pyle, Esq.
                                          Andrea A. Núñez, Esq.
                                          Representing the Class

**TABLE OF CONTENTS**

I.    INTRODUCTION...................................................................................1

II.   PROCEDURAL BACKGROUND ........................................................2

  1.  Plaintiffs' Claims ............................................................................2

  2.  Relevant Procedural History...........................................................3

  3.  Settlement Negotiations .................................................................4

III.  SUMMARY OF SETTLEMENT ........................................................4

  1.  The Settlement Class .....................................................................4

  2.  The Gross Settlement Amount .......................................................4

  3.  Settlement Payments to Class Members and PAGA Aggrieved Individuals ....................5

  4.  Funding and Distribution of Settlement Funds ..............................6

  5.  Uncashed Checks...........................................................................7

  6.  Released Claims ............................................................................7

    A.  Release of Class Claims .........................................................7

    B.  Release of PAGA Claims .......................................................7

IV.  THE NORTHERN DISTRICT OF CALIFORNIA'S PROCEDURAL GUIDELINES FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENTS............................................8

  1.  Class Members' Response...............................................................8

    A.  Number of Undeliverable Class Notices ................................9

    B.  Number of Class Members Who Submitted Valid Claims ............9

    C.  Number of Class Members Who Opted Out .............................9

    D.  Number of Class Members Who Objected to the Settlement........................9

    E.  Response to Objections .........................................................12

    F.  Class Members Who Disputed Their Workweeks or Requested to be Added to the Settlement ...............................................16

  2.  Settlement Agreement Signatories ...............................................16

V.  THE PROPOSED SETTLEMENT MEETS THE STANDARDS FOR FINAL APPROVAL 17

1.   The Settlement was a Result of Arm's-Length Negotiations ............................18

2.   *In re Bluetooth* Factors are not Present Here ..................................................18

3.   The Settlement is Fair....................................................................................19

   A.   All of Plaintiffs' Claims Revolve Around Whether They were Misclassified as Independent Contractors ..................................................................................................19

      i.   Employment Status.............................................................................19

      ii.   Plaintiffs' Underlying Claims..............................................................20

      iii.   The Claims Faced Many Formidable Obstacles that, if not Overcome, Would Result in the Class Taking Nothing or Very Little ...........................................................21

         1.   Establishing the Employment Relationship.............................................21

         2.   Risks on the Merits of Plaintiffs' Underlying Claims ...........................24

            a.   The Claims Under California Labor Code § 2802 Faced Real and Considerable Risks ..........................................................................................................24

               i.   Three out of Five Cases that have Ruled on the Issue in the Ninth Circuit and California Have Found that Labor Code § 2802 is Preempted by the Truth-in-Leasing Regulations for all but Cell Phone Reimbursements ...............................26

               ii.   URS Argues that It Pays Class Members an Enhanced Compensation to Cover Business Expenses ...............................................................................26

            b.   If the ICSAs can be Read to Compensate for All Transportation-Related Services, They Will Compensate for Driving and Non-Driving and Plaintiffs' Claims for Minimum Wage Violations Would Fail ...................................................27

            c.   The Ninth Circuit has Ruled the FMCSA Decision and Order Preempts the Enforcement of California Meal and Rest Period Claims – a Conclusion this Court Applied Earlier in this Case in Dismissing Meal and Rest Period Claims................28

         3.   Risks to Plaintiffs' Wage Statement and Waiting Time Penalties Claims........28

         4.   Risks to Plaintiffs' PAGA Claim .........................................................29

         5.   Maintaining Certification ....................................................................30

VI.   SUFFICIENT DISCOVERY AND INVESTIGATION HAS OCCURRED ..................31

VII.     CLASS COUNSEL HAVE EXTENSIVE EXPERIENCE ACTING AS CLASS COUNSEL ........................................................................................................................32

VIII.     THE CLASS MEMBERS' RESPONSE TO THE SETTLEMENT IS FURTHER EVIDENCE THAT THE SETTLEMENT IS FAIR AND REASONABLE ................................32

IX.     THE COURT SHOULD APPROVE THE SETTLEMENT ADMINISTRATION FEE .33

X.     THE COURT SHOULD APPROVE THE PAGA PAYMENT TO THE LWDA ...........33

XI.     CONCLUSION ....................................................................................................................34

# TABLE OF AUTHORITIES

**Cases**

*Amaral v. Cintas Corp. No. 2*, 163 Cal.App.4th 1157 (2008)......................................................29

*Ayala v. Antelope Valley Newspapers, Inc.* 59 Cal.4th 522 (2014)..........................................21

*Charron v. Wiener*, 731 F.3d 241 (2d Cir. 2013) ...................................................................15, 17

*City of Detroit v. Grinnel Corp.*, 495 F.2d 448 (2nd Cir. 1974) .................................................11

*Class Plaintiffs v. City of Seattle*, 955 F.2d 1268 (9th Cir. 1992) .........................................14, 17

*Eisen v. Porsche Cars N. Am., Inc.*, 2014 U.S. Dist. LEXIS 14301 *1 (C.D. Cal. Jan. 30, 2014)
.................................................................................................................................................11, 12

*Elliott v. Sperry Rand Corp.*, 680 F.2d 1225 (8th Cir.1982) ......................................................15

*Espejo v. The Copley Press, Inc.*, 13 Cal. App. 5th 329 (2017).............................................26, 27

*Flinn v. FMC Corp.*, 528 F.2d 1169 (4th Cir.1975) ...................................................................16

*Gattuso v. Harte-Hanks Shoppers, Inc.*, 42 Cal. 4th 554 (2017) ..............................................26

*Goyal v. CSX Intermodal Terminals, Inc.*. 17-cv-06081, 2018 U.S. Dist. LEXIS 164643 *1 (N.D. Cal. Sept. 25, 2018) ...............................................................................................................26

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) .........................................14, 17, 18, 19

*Henry v. Cent. Freight Lines, Inc.*, 2019 U.S. Dist. LEXIS 99594 *1 (E.D. Cal. June 13, 2019) 26

*In re Bluetooth Headset Products Liability Litigation*, 654 F.3d 935 (9th Cir. 2011)............18, 19

*In re Heritage Bond Litigation*, 2005 U.S. Dist. LEXIS 13555 *1 (C.D. Cal. June 10, 2005).....17

*Int'l Bhd. Of Teamsters, Local 2785 v. Fed. Motor Carrier Safety Administration*, 986 F.3d 841 (9th Cir. 2021) ........................................................................................................................28

*Joel A. v. Giuliani*, 218 F.3d 132 (2d Cir. 2000) .......................................................................17

*Kincade v. Gen.Tire & Rubber Co.*, 635 F.2d 501 (5th Cir.1981) ..............................................15

*Laskey v. Int'l Union*, 638 F.2d 954 (6th Cir.1981)....................................................................15

*Linney v. Cellular Alaska P'Ship*, 151 F.3d 1234 (9th Cir., 1998) ........................................12, 19

*Linton v. DeSoto Cab Co., Inc.* 15 Cal. App. 5th 1208 (2017) ..................................................23

*Mandujano v. Basic Vegetable Products, Inc.*, 541 F. 2d 832 (9th Cir. 1976) ...........................32

*Marshall v. Holiday Magic*, 550 F.2d 1173 (9th Cir.1977) ..................................................11, 19

*Milligan v. Toyota*, 2012 U.S. DIST. LEXIS 116720 *1 (N.D. Cal. Jan. 6, 2012)................11, 12

*Officers for Justice v. Civil Service Comm. of City and County of San Francisco*, 688 F. 2d 615

    (9th Cir. 1982) ............................................................................11, 12, 19

*Parker v. Anderson*, 667 F.2d 1204 (5th Cir. 1982)..............................................15, 17

*Perez v. DIRECTV Grp. Holdings, LLC*, 2023 U.S. Dist. LEXIS 13920 *1 (C.D. Cal. Jan. 23,

    2023)......................................................................................................12

*Pettway v. American Cast Iron Pipe Co.*, 576 F.2d 1157 (5th Cir.1978), *cert. denied*, 439 U.S.

    1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979)................................................16

*Rodriguez v. West Publishing Corp.*, 563 F.3d 948 (9th Cir. 2009) ......................17, 18

*Rosado v. Ebay Inc.*, 2016 U.S. Dist. LEXIS 80760 *1 (N.D. Cal. June 20, 2016)..............11, 12

*S.G. Borello & Sons, Inc. v. Department of Industrial Relations*, 48 Cal.3d 341 (1989) ............20

*Salter v. Quality Carriers*, 20-cv-479, 2021 U.S. Dist. LEXIS 213111 *1 (C.D. Cal. Oct. 27,

    2021)......................................................................................................27

*Thomas v. Christopher*, 169 F.R.D. 224 (D.D.C. 1996) ...........................................11

*Thurman v. Bayshore Transit Management, Inc*, 203 Cal. App. 4th 1112 (2012)......................30

*Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370 (9th Cir. 1993) ...........................................11, 12

*Valdez v. CSX Intermodal Terminals, Inc.*, 15-cv-05433, 2017 U.S. Dist. LEXIS 66923 *1 (N.D.

    Cal. April 10, 2017)......................................................................................25

*Van Ba Ma v. Covidien Holding, Inc.*, 2014 U.S. Dist. LEXIS 76359 *1 (C.D. Cal. 2014).........19

## I. INTRODUCTION

Named Plaintiffs Robert Bejar and Martin Chavez (hereinafter "Plaintiffs") seek final approval of the Parties' Joint Stipulation of Settlement and Release of Class Action Claims (hereinafter "Joint Stipulation" or "Settlement Agreement"[1]). The proposed settlement is a non-reversionary $7,500,000 class action settlement achieved on behalf of 321 Class Members. The Class is defined as "all individuals who signed Independent Contractor Service Agreements with URS, who were assigned to a business unit in California, and who drove in California at any time from November 18, 2015 to March 29, 2022. If the individual executing the Independent Contractor Service Agreement did so on behalf of a corporation or LLC, then the individual or individuals who were principals or owners of the corporation or LLC shall be considered part of the Class." (Exhibit 1 at Section I, Paragraph 5, Page 2).

The settlement is projected to pay each Class Participant, meaning any and all Class Members who did not submit a timely and valid Opt-Out Request,[2] an average payment of approximately $17,010.45. (*See* Declaration of Lluvia Islas of Phoenix Settlement Administrators in Support of Motion for Final Approval of Class Action Settlement ("Islas Dec.") ¶ 13). The highest estimated payment to Class Participants is approximately $40,961.89 and the lowest payment, representing one workweek worked, is $111.92. (Islas Dec. ¶ 14).

In addition, the settlement includes PAGA Aggrieved Individuals. PAGA Aggrieved Individuals are Class Members that worked at any time during the PAGA Period. (Exhibit 1 at Section I, Paragraph 25, Page 5). The PAGA Period is February 10, 2019, through September 26, 2023 (the date the Court granted preliminary approval). (Exhibit 1 at Section I, Paragraph 28, Page 5). There are 242 PAGA Aggrieved Individuals. (Islas Dec. ¶ 14). The Joint Stipulation allocates $126,325 to civil penalties recoverable under PAGA, of which 75% – or $94,743.75 – will be paid to the LWDA; and 25% – or $31,581.25 – will be distributed among PAGA Aggrieved Individuals. (Exhibit 1 at Section III, Paragraph 3, Page 12). The average payment to

---

[1] The Joint Stipulation is attached to the Declaration of David Mara, Esq. ("Mara Dec.") as Exhibit 1. "Exhibit 1" referenced herein refers to the Joint Stipulation.
[2] Exhibit 1 at Section I, Paragraph 11, Page 3.

PAGA Aggrieved Individuals is approximately $130.50. (Islas Dec. ¶ 14). The highest payment to PAGA Aggrieved Individuals is approximately $311.02, and the lowest payment is approximately $1.46. (Islas Dec. ¶ 14).

In response to the Class Notice, no Class Members requested to be excluded from the settlement. (Islas Dec. ¶ 8). Therefore, all 321 Class Members are participating in the settlement. Twenty-eight (28) Class Members – representing 9% of the Class – submitted identical objections to the settlement, which, for the reasons discussed herein, should be overruled as they do not alter the conclusion that the settlement is fair and reasonable and in the best interests of the Class. For the reasons that follow, it is respectfully requested the Court grant this motion and find the settlement is fair, reasonable, and adequate.

## II.    PROCEDURAL BACKGROUND

URS transports vehicles for customers throughout the continental United States. To accomplish that business purpose, URS contracts with drivers it classifies as independent contractors. Plaintiffs contend that these drivers should be classified as employees.

### 1.    Plaintiffs' Claims

On November 18, 2019, Plaintiff Denson M. Sales filed his Class Action Complaint for Damages, Injunctive Relief, Declaratory Relief, and Restitution in the Superior Court of Alameda County, California, under Case No. HG19043648 (the "*Sales* Action"), alleging that URS had misclassified him as an independent contractor and asserting a number of wage-and-hour claims under California law. On December 24, 2019, URS removed the case to this Court. (Mara Dec. ¶ 8).

On February 11, 2020, Plaintiff Andre Clemons filed his Class Action Complaint for Damages and Injunctive Relief in the Superior Court of Alameda County, California, under Case No. RG20054053 (the "*Clemons* Action"), alleging that URS had misclassified him as an independent contractor and asserting a number of wage-and-hour claims under California law. On April 3, 2020, URS removed the case to this Court under Case No. 4:20-cv-02274. (Mara Dec. ¶ 9).

On April 23, 2020, the Court related the *Sales* Action with the *Clemons* Action. On May

4, 2020, the Court granted a request to permit Plaintiff Sales and Plaintiff Clemons to file a joint complaint incorporating Plaintiff Clemons and his claims into the *Sales* Action. The *Clemons* Action was subsequently dismissed on May 27, 2020. (Mara Dec. ¶ 10).

Plaintiff Sales and Plaintiff Clemons jointly filed a First Amended Complaint on May 4, 2020, asserting the following Claims under California law: (1) failure to pay all straight time wages at statutory minimum wage; (2) failure to provide meal periods; (3) failure to authorize and permit rest periods; (4) failure to reimburse/illegal deductions; (5) violations of unfair competition law; (6) knowing and intentional failure to properly itemize wage statements; (7) failure to timely pay all wages owed at termination; and (8) violations of California's Private Attorneys General Act ("PAGA"). Plaintiffs Sales and Clemons brought these claims on behalf of themselves and all others similarly situated. (Mara Dec. ¶ 11).

On May 18, 2023, a Second Amended Complaint was filed pursuant to which Plaintiffs Robert Bejar and Martin Chavez were added into this action as plaintiffs and class representatives. (Mara Dec. ¶ 12).

On May 17, 2023, Plaintiffs Robert Bejar and Martin Chavez filed an amended PAGA letter with the Labor and Workforce Development Agency ("LWDA"). (Mara Dec. ¶ 13).

## 2. Relevant Procedural History

URS filed a Motion to Dismiss Plaintiff Clemons' and Plaintiff Sales' Meal and Rest Break Claims on May 18, 2020. URS argued that the FMCSA hours-of-service preemption determination prohibited enforcement of any meal and rest break claims with regard to interstate drivers of commercial motor vehicles. After briefing was completed, the Court granted this motion on July 17, 2020, and dismissed Plaintiff Clemons' and Plaintiff Sales' second and third causes of action with prejudice. (Mara Dec. ¶ 14).

Plaintiff Clemons and Plaintiff Sales filed a Motion for Class Certification on April 29, 2021. Plaintiff Clemons and Plaintiff Sales requested certification of the following class: "All individuals who signed Independent Contractor Service Agreements with URS, who were assigned to a business unit in California, and who drove in California at any time from November 18, 2015, to the date the Court enters an order certifying the matter as a class action." After

briefing was completed, the Court granted this motion on March 29, 2022, and certified the Class as defined. (Mara Dec. ¶ 15).

### 3. Settlement Negotiations

This settlement was reached with the assistance of an experienced mediator, Jeffrey Ross, after arms-length bargaining by the Parties at a formal mediation scheduled on November 4, 2021, and extensive subsequent conversations. The Parties' settlement has been memorialized in a long form settlement agreement. The Parties now seek the Court's final approval of their Joint Stipulation, which is attached to the Declaration of David Mara, Esq., in Support of Plaintiffs' Motion for Final Approval of Class Action and PAGA Settlement as Exhibit 1. (*See* Mara Dec. ¶ 18).

## III. SUMMARY OF SETTLEMENT

The principal terms of the Joint Stipulation are as follows:

### 1. The Settlement Class

The Class set forth in the Joint Stipulation is defined as follows:

> All individuals who signed Independent Contractor Service Agreements with URS, who were assigned to a business unit in California, and who drove in California at any time from November 18, 2015 to March 29, 2022. If the individual executing the Independent Contractor Service Agreement did so on behalf of a corporation or LLC, then the individual or individuals who were principals or owners of the corporation or LLC shall be considered part of the Class.

(Exhibit 1 at Section I, Paragraph 5, Page 2). There are 321 individuals who fall within this Class definition.

### 2. The Gross Settlement Amount

Under the Joint Stipulation, URS shall pay $7,500,000 (referred to as the "Gross Settlement Amount" or "GSA") to fully and finally settle this matter. This is the total amount URS is required to pay under the Joint Stipulation. ***No portion of the GSA will revert to URS for any reason.*** Subject to the Court's final approval, the following deductions will be made from the GSA: (1) $1,875,000 (25% of the GSA) to Class Counsel for attorneys' fees to compensate them for their work on the lawsuit, as well as any work remaining in securing Court approval of the settlement, administration of the settlement, and obtaining dismissal of the lawsuit; (2)

$27,320.60 (previously estimated not to exceed $50,000) to Class Counsel for reimbursement of their litigation costs; (3) $11,000 to Phoenix Settlement Administrators ("Phoenix") for its work performed and to be performed in administering the settlement; and (4) $94,743.75 to the California Labor and Workforce Development Agency ("LWDA") for its 75% share of the $126,325 PAGA Payment.

### 3. Settlement Payments to Class Members and PAGA Aggrieved Individuals

After all deductions have been made, it is estimated that $5,460,354.40 ("Net Settlement Amount" or "NSA") will be available for disbursement to Class Participants, resulting in an average payment of $17,010.45. (Islas Dec. ¶ 13). Per the Joint Stipulation, "Class Participants" are defined as "[a]ny and all Class Member(s) who do not submit a timely and valid Opt-Out Request." (Exhibit 1 at Section I, Paragraph 11, Page 3). The money available for payout to these individuals comes out of the NSA, which is what remains of the GSA after subtracting all Court approved attorneys' fees and costs, settlement administration costs, and the LWDA's portion of the PAGA Payment.

Individual Settlement Amounts to be paid from the Net Settlement Amount to the Class Participants will be determined as follows:

> Each of the Class Participants shall receive a pro rata share of the Net Settlement Amount. Pro rata shares shall be determined by, first, determining the value of a single Week Worked by dividing the Net Settlement Amount by the total number of Weeks Worked by all Class Participants during the Class Period. Individual Settlement Amounts will be determined by multiplying the value of a single Week Worked by the number of the total Weeks Worked by each Class Participant during the Class Period.

(Exhibit 1 at Section IV, Paragraph 1(b), Page 14), Therefore, the value of each Class Member's Individual Settlement Share ties to the amount of weeks that he or she worked.

In addition, each PAGA Aggrieved Individual will receive a proportionate share of the PAGA Payment that is allocated for distribution to PAGA Aggrieved Individuals (i.e., 25% of the PAGA Payment). Under the terms of the Joint Stipulation, $126,325 is allocated to civil penalties recoverable under PAGA, of which 75%, or $94,743.75, will be paid to the LWDA; and 25%, or $31,581.25, will be distributed among PAGA Aggrieved Individuals. (Exhibit 1 at Section III, Paragraph 3, Page 12). Each of the PAGA Aggrieved Individuals shall receive a pro

rata share of the PAGA Payment available for distribution to PAGA Aggrieved Individuals. Pro rata shares shall be determined as follows:

> Each of the PAGA Aggrieved Individuals shall receive a pro rata share of the PAGA Payment available for distribution to PAGA Aggrieved Individuals. Pro rata shares shall be determined by, first, determining the value of a single Week Worked by dividing the PAGA Payment available for distribution to PAGA Aggrieved Individuals by the total number of Weeks Worked by all PAGA Aggrieved Individuals during the PAGA Period. Individual Settlement Amounts will be determined by multiplying the value of a single Week Worked by the number of the total Weeks Worked by each PAGA Aggrieved Individuals during the PAGA Period.

(Exhibit 1 at Section IV, Paragraph 1(b), Page 14).

For the purpose of calculating applicable taxes for the payment of the Individual Settlement Amounts paid to Class Participants and PAGA Aggrieved Individuals, 100% of the Individual Settlement Amounts will be paid on a 1099 basis and will not be subject to tax withholding. The Settlement Administrator shall be responsible for issuing and providing Form 1099s to Class Participants and PAGA Aggrieved Individuals for their Individual Settlement Amounts. (Exhibit 1 at Section III, Paragraph 6, Pages 12-13).

### 4. Funding and Distribution of Settlement Funds

On October 11, 2023, URS remitted $10,000 by wire transfer to the Settlement Administrator from the Gross Settlement Amount for partial payment of the Settlement Administrator's costs and expenses to administer the Settlement. Within thirty days after the Effective Date, URS will remit the balance of the Gross Settlement Amount to the Settlement Administrator by wire transfer. (*See* Exhibit 1 at Section III, Paragraphs 7-8, Page 13).

The "Effective Date" is the date when all of the following events have occurred: (a) the Joint Stipulation has been fully executed; (b) the Court has given preliminary approval to the settlement; (c) notice has been given to the Class Members providing them with an opportunity to opt-out of the settlement; (d) if more than 10% of the Class Members opt-out, URS has elected not to exercise its rights to void the settlement; (e) the Court has held a Final Approval and Fairness Hearing and entered a final order and judgment approving the Joint Stipulation; and (f) the later of the following dates: (i) when the period for filing any appeal, writ, or other appellate proceeding opposing the settlement has elapsed without any appeal, writ, or other appellate

proceeding having been filed; or (ii) any appeal, writ, or other appellate proceeding opposing the settlement has been dismissed finally and conclusively with no right to pursue further remedies or relief; or (iii) any appeal, writ, or other appellate proceeding has upheld the Court's final order with no right to pursue further remedies or relief. In this regard, it is the intention of the Parties that the settlement shall not become effective until the Court's order approving the settlement is completely final and there is no further recourse by an appellant or objector who seeks to contest the settlement. (Exhibit 1 at Section I, Paragraph 15, Page 3).

The Settlement Administrator shall disburse the payments outlined in the Joint Stipulation, as approved of by the Court, no later than 14 days after receipt of the settlement funds.

## 5. Uncashed Checks

Funds from uncashed checks will be sent to the California State Controller – Unclaimed Property Division, with the identity of the Class Participant to whom the funds belong. (*See* Exhibit 1 at Section IV, Paragraph 5, Page 16). That allows Class Participants who do not cash their settlement checks to collect their settlement funds at a later date from the California State Controller.

## 6. Released Claims

### A. Release of Class Claims

The Released Class Claims set forth in the Joint Stipulation are:

All claims that were plead in the Second Amended Complaint, including claims for unpaid minimum wages under Cal. Lab. Code §§ 558, 1182.1-1182.3, 1194, 1194.2, 1197, and 1198; unpaid meal and rest breaks under Cal. Lab. Code §§ 558, 226.7, and 512, Cal. Code Regs., tit. 8 § 11090, and IWC Wage Order No. 9-2011; failure to reimburse/illegal deductions under Cal. Lab. Code §§ 221 and 2802, and Cal. Regs., tit. 8 § 11090; related claims under California Labor Code §§ 201-3, 226, 204, 210; and claims for unlawful business practices under the California Business and Professions Code §§ 17200, *et seq.*, as alleged in the Second Amended Complaint. The Released Class Claims shall be for the Class Period.

(Exhibit 1 at Section I, Paragraph 34, Page 6).

### B. Release of PAGA Claims

The Released PAGA Claims set forth in the Joint Stipulation are:

All claims asserted in the Operative PAGA letter and/or the Second Amended Complaint, including claims for unpaid minimum wages under Cal. Lab. Code §§ 558, 1182.1-1182.3,

1194, 1194.2, 1197, and 1198; failure to pay wages due for missed meal and rest breaks under Cal. Lab. Code §§ 226.7, and 512; failure to reimburse/illegal deductions under Cal. Lab. Code § 2802; and related claims under California Labor Code §§ 201-203, 204, 210, and 226, 226.3, and 226.8. The Released PAGA Claims shall be for the PAGA Period.

(Exhibit 1 at Section I, Paragraph 35, Page 6).

## IV. THE NORTHERN DISTRICT OF CALIFORNIA'S PROCEDURAL GUIDELINES FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENTS

Each of the criteria outlined in the Northern District of California's Procedural Guidelines for Class Action Settlements are addressed herein. Pursuant to this Court's Standing Order for All Civil Cases Before District Judge Jon S. Tigar, each of the respective guidelines are addressed in the order the guidelines are presented on the Northern District of California's website.

The Northern District of California's Procedural Guidelines for Class Action Settlements requests information regarding Class Members' response to the settlement, attorneys' fees, and service awards. The information requested regarding attorneys' fees was provided in Plaintiffs Robert Bejar and Martin Chavez's Motion for Attorneys' Fees and Costs. (ECF No. 122). There are no service awards being sought as part of this settlement.

Accordingly, Plaintiffs only address the Class Members' response to the settlement herein, including information about the number of undeliverable class notices, the number of class members who submitted valid claims, the number of class members who opted out, and the number of class members who objected to or commented on the settlement. Plaintiffs also respond to the objections filed.

### 1. Class Members' Response

The Court granted preliminary approval of the settlement on September 26, 2023. (ECF No. 98). At that time, Phoenix was appointed by the Court as the Settlement Administrator. After the Court granted preliminary approval, URS sent the Class List[3] to Phoenix. (Islas Dec. ¶ 3).

Phoenix conducted a National Change of Address search on the addresses in the Class List to update the addresses as accurately as possible. (Islas Dec. ¶ 4). A search of this database provides updated addresses for any individual who has moved in the previous four (4) years and

---

[3] The "Class List" includes the names, Social Security numbers, last-known addresses, phone numbers, and email addresses, and contract lease and termination dates of Class Members. (*See* Exhibit 1 at Section I, Paragraph 7, Page 2).

notified the U.S. Postal Service of their change of address. (*Id.*). The Class Notice was mailed and emailed to Class Members on November 3, 2023, in English and Spanish.[4] (Islas Dec. ¶ 5).

### A. Number of Undeliverable Class Notices

Nineteen (19) Class Notices were returned to Phoenix. (Islas Dec. ¶ 6). None were returned with a forwarding address. (*Id.*). For the nineteen (19) Class Notices returned from the Post Office without a forwarding address, Phoenix attempted to locate a current mailing address using idiCORE, one of the most comprehensive address databases available for skip tracing. (*Id.*). Of the nineteen (19) Class Notices that were skip traced, fifteen (15) updated addresses were obtained and the Class Notice was promptly re-mailed to those Class Members via first class mail. (*Id.*). Four (4) Class Notices remain undeliverable, because an updated address could not be obtained via skip trace. (Islas Dec. ¶ 7). These four (4) Class Notices represent 1.2% of the Class Members.

### B. Number of Class Members Who Submitted Valid Claims

Class Participants do not need to do anything to receive a settlement payment. As such, no claims were submitted by Class Members.

### C. Number of Class Members Who Opted Out

Class Members had the option of requesting to be excluded from the settlement. No requests for exclusion were received by Phoenix. (Islas Dec. ¶ 8). Therefore, 100% of the Class Members are participating in the settlement.

### D. Number of Class Members Who Objected to the Settlement

Thirty-four (34) identical objections were submitted to the Court,[5] all raising the same seven arguments as to why they believe the settlement should not be finally approved. (All objectors will hereinafter be collectively be referred to as "Objectors"). Before addressing each

---

[4] At preliminary approval, the Parties did not believe a Spanish translation was necessary as all Class Members signed agreements with URS in English. After preliminary approval, Class Counsel determined that some Class Members felt more comfortable with the Spanish language and added a Spanish translation to the administration process before the Class Notices were mailed.
[5] *See* ECF Nos. 99, 100, 101, 102, 103, 104, 105, 105, 107, 108, 109, 110, 111, 112, 113, 114, 115, 116, 117, 118, 119, 120, 121, 123, 125, 126, 127, 128, 129, 130, 133, 134, 136, and 138.

of those grounds for objecting, there are a few important preliminary considerations that are worth noting about the objections the Court received.

First, the overwhelming majority of objections received by the Court appear to be a form that was provided to the prospective objector. Twenty-one (21) of the objections received by the Court show that the prospective objector was prompted on where to provide their contact information. For instance, in each of these twenty-one (21) objections, under "Sincerely," the prospective objector is prompted on where to place "{Your signature}" and where to "{print your Name}", "{print your Address}", "{print your City, State, Zip Code}", "{print your Email address}", and "{print your Phone number}." (*See* ECF Nos. 99, 100, 102, 106, 107, 109, 100, 111, 112, 114, 115, 116, 118, 119, 120, 125, 127, 129, 134, 136, and 138). Based on this, it seems clear the objections were, on some level, the product of a campaign to obtain as many objectors as possible by making it as easy as possible on prospective objectors to send the form to the Court.

Another fact to note about the objections is the fact that five (5) of the individuals who mailed the objection form to the Court are not Class Members and did not receive a settlement notice.[6] Thus, these people are objecting to a settlement they have not seen, and which does not concern any of their rights. It is axiomatic that only Class Members can object to the settlement and these objections here from non-Class Members must be rejected. What is most concerning, however, is the fact that these objections were sent to the Court in the first place. These circumstances raise considerable questions over the process of how the objections were procured.

Despite the above, the number of objections from individuals with standing to object is heavily outweighed by the overwhelming majority of the Class who approve of the settlement. There are 321 total Class Members here. None have opted out. The total amount of objections received and not withdrawn from Class Members is twenty-eight (28).[7] Thus, 91% of Class

---

[6] The following individuals who did not receive Class Notices and who are not Class Members filed objections: Timothy Williams (*See* ECF No. 99, November 8, 2023); Jose Sandoval (*See* ECF No. 106, November 20, 2023); Daniel Rosales (*See* ECF No. 108, November 22, 2013); James Wade Patrick (*See* ECF No. 133, December 18, 2023); and Trina and Tony Wallace (*See* ECF No. 127, December 4, 2023).

[7] David Nigma mailed an objection in (*see* ECF No. 125) and later withdrew it (*see* ECF No. 140).

Members approve of the settlement versus 9% of the Class who want to see it set aside. Such a high percentage of those in favor of the settlement "is certainly evidence that the settlement is not unfair or inadequate in the opinion of the class." *Thomas v. Christopher*, 169 F.R.D. 224, 242-243 (D.D.C. 1996); *see also Officers for Justice v. Civil Service Com.*, 688 F.2d 615, 629 (9th Cir. 1982), quoting from *City of Detroit v. Grinnel Corp.*, 495 F.2d 448, 462 (2nd Cir. 1974) ("Any claim by appellants that the settlement offer is grossly and unreasonably inadequate is belied by the fact that, from all appearances, the vast preponderance of the class members willingly approved the offer.").[8]

The expressed will of 91% of the Class should not be overturned by 9% of individuals in a settlement the Court has found to be fair and reasonable, particularly where, as here, the 9% could have protected their individual rights by opting out. *See Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1378 (9th Cir. 1993) (the concerns of the objectors regarding the settlement could have been addressed in individual lawsuits had the objectors elected to opt out of the Settlement); *Eisen v. Porsche Cars N. Am., Inc.*, 2014 U.S. Dist. LEXIS 14301 *1, *20 (C.D. Cal. Jan. 30, 2014) ("Federal courts routinely hold that the opt-out remedy is sufficient to protect class members who are unhappy with the negotiated class action settlement terms."); *Milligan v. Toyota*, 2012 U.S. DIST. LEXIS 116720 *1, *9 (N.D. Cal. Jan. 6, 2012) (overruling multiple objections to a class action settlement, reasoning that the objectors "have the ability to opt-out if they do not like the terms of the settlement"); *see also Marshall v. Holiday Magic*, 550 F.2d 1173, 1177 (9th Cir.1977); *Rosado v. Ebay Inc.,* 2016 U.S. Dist. LEXIS 80760 *1, *28-*29 (N.D. Cal. June 20, 2016).

Additionally, the objections should be overruled because all the stated bases lack merit for the following reasons.

---

[8] *See also EEOC v. Hiram Walker & Sons, Inc.,* 768 F.2d 884, 892 (7th Cir.1985) (approval over objections of 15% of 253 member class), *cert. denied,* 478 U.S. 1004, 106 S.Ct. 3293, 92 L.Ed.2d 709 (1986); *Bryan v. Pittsburgh Plate Glass Co.,* 494 F.2d 799, 803 (3d Cir.1974), *cert. denied,* 419 U.S. 900, 95 S.Ct. 184, 42 L.Ed.2d 146 (1974) (approval over objections of approximately 20% of 452 member class reasoning that "a settlement is not unfair or unreasonable simply because a large number of class members oppose it").

E.  **Response to Objections**

 **The Objectors' first argument** is that "[t]he gross settlement amount offered does not represent the minimum wages owed to approximately 309 plaintiffs in accordance to defendant's uniform payment policy of paying approximately 309 plaintiffs 80% of the revenue defendant receives for hauling a load; plus, additional expenses such as insurance, fuel, damages, truck maintenance, pain and suffering." This claim should be rejected. It asks the Court to set aside the settlement because the settlement amount does not reflect the total amount in minimum wages and expense reimbursements the Class could have received at trial, which does not render a settlement unfair and disregards the nature of compromise settlements embody.[9]

 Furthermore, each of the Objectors could have opted out of the settlement. Their rights were thus fully protected, and they could have pursued their individual claims had they wished to do so.[10]

 Moreover, the Objectors' first argument completely ignores the risk of losing should the settlement not be approved. In support of preliminary approval, Plaintiffs plainly explained the multiple and very real risks – and authority substantiating the reality of those risks – of losing on

---

[9] See *Officers for Justice v. Civil Serv. Com.*, 688 F.2d at 624 ("[T]he very essence of a settlement is compromise, a yielding of absolutes and an abandoning of highest hopes…Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with litigation…"); *Linney v. Cellular Alaska P'Ship*, 151 F.3d 1234, 1242 (9th Cir. 1998) (a proposed settlement may be fair, adequate, and reasonable even though greater recovery might be available to the class members at trial.); *Perez v. DIRECTV Grp. Holdings, LLC*, 2023 U.S. Dist. LEXIS 13920 *1 (C.D. Cal. Jan. 23, 2023) (rejecting an objectors claim that the settlement was inadequate because "the amount that they will receive in settlement is too low to compensate for the damages they suffered.").

[10] *See Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1378 (9th Cir. 1993) (the concerns of the objectors regarding the settlement could have been addressed in individual lawsuits had the objectors elected to opt out of the Settlement); *Eisen v. Porsche Cars N. Am., Inc.*, 2014 U.S. Dist. LEXIS 14301 *1, *20 (C.D. Cal. Jan. 30, 2014) ("Federal courts routinely hold that the opt-out remedy is sufficient to protect class members who are unhappy with the negotiated class action settlement terms.; *Milligan v. Toyota*, 2012 U.S. DIST. LEXIS 116720 *1, *9 (N.D. Cal. Jan. 6, 2012) (overruling multiple objections to a class action settlement, reasoning that the objectors "have the ability to opt-out if they do not like the terms of the settlement"); *see also Marshall v. Holiday Magic*, 550 F.2d 1173, 1177 (9th Cir.1977); *Rosado*, 2016 U.S. Dist. LEXIS at *28-*29.

the misclassification issue (which would defeat all claims) or on the reimbursement claims. (*See* Motion for Preliminary Approval, ECF No. 95, Pgs. 9-18). Objectors, on the other hand, completely ignore those very real hurdles to prevailing on the merits and ask this Court to deny settlement approval based solely on their unabated and unsubstantiated optimism of total and complete victory both in the trial court, should the matter proceed to a judgment, and on appeal.

As the Court found at preliminary approval, so too should it find now: "the Joint Stipulation, and the obligations of the Parties as set forth therein, is fair, reasonable, and is an adequate settlement of this case and is in the best interests of the Class *in light of the factual, legal, practical, and procedural considerations raised by this case."* (Court's Order Granting Preliminary Approval of Class Action Settlement, ECF No. 98, pg. 2, lines 23-25)(emphasis added).

***The Objectors' second argument*** is that "[t]he defendant or class counsel failed to disclose the revenue information (OVISS information) that the defendant received for hauling a load to substantiate the amount owed to approximately 309 plaintiffs in accordance to the uniform payment policy, which does not substantiate the gross settlement amount." This claim has no merit and does not impact the reasonableness of the settlement.

The Objectors' second argument is based on a claim that URS breached its contract with Class Members. But that claim has not been pled in this lawsuit and is not being released here.[11]

While this claim is not relevant to the settlement at hand, it is worth noting that to the extent this argument is referring to a claim that URS failed to pay Class Members the 80% of the "Transport Revenue" it was contractually obligated to pay drivers, it seems to stem from a flawed premise that Class Members were entitled to 80% of the revenue URS received from customers. However, in each of the Independent Contractor Service Agreements applicable during the class period, URS did not agree to pay drivers 80% of the revenue they received from customers.

---

[11] As the Court's Order Granting Preliminary Approval noted, "[t]he Joint Stipulation provides for the following release as to Class Participants, which is hereby approved conditionally: All claims that were plead in the Second Amended Complaint…" (*See* ECF No. 98, Pg. 3, lines 16-18).

Rather, in each of the Independent Contractor Service Agreements Class Members signed during the class period, URS agreed to pay Class Members 80% of the "Transport Revenue," which was defined in the agreements as the amount charged by the Carrier (URS Midwest, Inc.) for the transportation of cargo "less amounts related to fuel price fluctuations; toll adjustments; logistics fees; expediting; and any payments to third parties, such as brokers, which may vary from time to time." (Exhibit 2 attached to the Mara Dec., Exemplar of an Independent Contractor Service Agreement at Paragraph 3(a)). These agreements therefore anticipate that Class Members will receive less than 80% of the revenue received from customers in amounts that will vary. Thus, even if Class Members received less than 80% of what URS received from customers for the loads hauled, such would not evidence that Class Members were paid less than they were contractually entitled to receive.

The Court should also reject *the Objectors' third reason for objecting*: that the motion for preliminary approval purportedly did not provide how the Parties reached the Settlement. The motion for preliminary approval explains the procedural history of the case, as well as the history of the negotiations that led to settlement. (*See* Motion for Preliminary Approval of Class Action Settlement, ECF No. 95, Pgs. 3-5). The motion further explains why the settlement is fair, adequate, and reasonable, and not a product of collusion. (*See* Motion for Preliminary Approval of Class Action Settlement, ECF No. 95, Pgs. 5, 9-23). The motion for final approval further addresses these issues. (*See* Section V, below). Accordingly, Plaintiffs Bejar and Chavez have met their obligations under the applicable caselaw. *See Hanlon v. Chrysler Corp.*, 150 F.3d. 1011, 1026 (9th Cir. 1998); *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992).

***The Objectors' fourth reason*** for why the settlement should be rejected is that "Class Counsel failed to provide all of the documentation in the Joint Stipulation of settlement; specifically, Exhibit I which is not in the best interest of the class." There is no "Exhibit I" to the Joint Stipulation. There is an Exhibit 1, which was attached to the Joint Stipulation that was filed with the Court in support of the motion for preliminary approval. (*See* Exhibit 1 to the Declaration of David Mara, Esq., in Support of Motion for Preliminary Approval of Class Action Settlement, ECF No. 95-1, Pgs. 64 to 74). Thus, Objector's argument here has no merit.

**_Objectors' fifth ground for objection_** complains that the settlement is not in the best interests of the Class Members because Denson Sales and Andre Clemons did not agree to the amendment of the complaint to add Robert Bejar and Martin Chavez as class representatives. This argument fails to show that the settlement is unfair and unreasonable and should be rejected. That Robert Bejar and Martin Chavez were added to the complaint as additional class representatives does not render the settlement unfair and unreasonable. If anything, the stipulation and Order to add them as class representatives has proven the opposite. In signing the settlement agreement, representatives Bejar and Chavez have proven their interests are aligned with the 91% of the Class Members who also support the settlement.

**_Objectors' final grounds for objecting (the sixth and seventh)_** claim that the settlement is not in the best interests of the Class because it was entered into without the support of a majority of Class Members or all class representatives. First, the claim that a majority of Class Members have not agreed to the settlement is demonstrably false. As the settlement administration has proven, no Class Members have opted out and 91% of the Class approves of the settlement. Thus, far from a majority of Class Members not approving the settlement, the overwhelming majority of Class Members are in favor of it.

In addition, Objectors are wrong that Plaintiffs Bejar and Chavez required the unanimous consent of all class representatives before they could sign off on the settlement agreement. Courts have ruled that "agreement of the named plaintiffs is not essential to approval of a settlement which the trial court finds to be fair and reasonable." *Parker v. Anderson*, 667 F.2d 1204, 1211 (5th Cir. 1982); *see also Charron v. Wiener*, 731 F.3d 241, 254 (2d Cir. 2013) (Finding "the assent of class representatives is not essential to the settlement, as long as the Rule 23 requirements are met.").[12] As the Fifth Circuit noted in *Parker*, "[t]he rationale implicit in these decisions is sound:

---

[12] *Charron* cites the following cases in support of this rule: *Elliott v. Sperry Rand Corp.,* 680 F.2d 1225, 1226, 1228 (8th Cir.1982); *Kincade v. Gen.Tire & Rubber Co.,* 635 F.2d 501, 508 (5th Cir.1981) ("[T]he assent of named plaintiffs is not a prerequisite to the approval of a settlement." (internal quotation marks omitted)); *Laskey v. Int'l Union,* 638 F.2d 954, 956-957 (6th Cir.1981) ("Class counsel is supposed to represent the class, not the named parties: that the named parties

the named plaintiffs should not be permitted to hold the absentee class hostage by refusing to assent to an otherwise fair and adequate settlement in order to secure their individual demands." *Id.*; see also *Rodriguez v. west Publ'g Corp.*, 2007 U.S. Dist. LEXIS 74849 *1, *49 (C.D. Cal. August 10, 2007) (rejecting "arguments by four Objectors or groups of Objectors that the Settlement should not be approved because the Objecting Plaintiffs object to the terms of the Settlement.").

For the foregoing reasons, the Court is respectfully requested to overrule the objections and grant final approval of the settlement.

### F.  Class Members Who Disputed Their Workweeks or Requested to be Added to the Settlement

Phoenix received fourteen (14) workweek disputes from Class Members. (Islas Dec. ¶ 10). These workweek disputes were accepted by Phoenix. (*Id.*). Two (2) additional individuals requested to be added to the Class. (Islas Dec. ¶ 11). These two added individuals increased the number of Class Members from 319 to 321.

### 2.  Settlement Agreement Signatories

In the Court's preliminary approval order, the Court states that the "motion for final approval shall also address why fewer than all of the named plaintiffs executed the settlement agreement." (Court's Order Granting Preliminary Approval of Class Action Settlement, ECF No. 98, ¶ 17). Two of the named plaintiffs, Denson M. Sales and Andre Clemons, did not agree with the settlement for the reasons stated in their objections. For the reasons discussed above, these objections do not render the settlement unreasonable and inadequate. Furthermore, as courts have

---

objected does not prove the settlement was unfair or that the class counsel acted improperly."); *Flinn v. FMC Corp.,* 528 F.2d 1169, 1174 n. 19 (4th Cir.1975) ("Appellants do not argue, nor may they under the authorities, that assent of the class Plaintiffs is essential to the settlement, provided the trial court finds it fair and reasonable."); *Pettway v. American Cast Iron Pipe Co.,* 576 F.2d 1157, 1216 (5th Cir.1978), *cert. denied,* 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979) ("To be sure, the assent of named Plaintiffs is not a prerequisite to court approval."); *Horton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 855 F.Supp. 825 (E.D.N.C.1994) (approval over objections of majority of named Plaintiffs).

noted, the assent of all class representatives is not necessary to finding a class settlement is fair, reasonable, and in the best interests of the class. *Parker*, 667 F.2d at 1211; *Charron*, 731 F.3d at 254; *Rodriguez*, 2007 U.S. Dist. LEXIS 74849 at *49; *see also* fn 12, above.

## V. THE PROPOSED SETTLEMENT MEETS THE STANDARDS FOR FINAL APPROVAL

Matters that have been filed as class actions require court approval before a settlement can be consummated. *See* Fed. R. Civ. Proc. ("FRCP") 23(e). FRCP 23(e) provides that any compromise of a class action must receive Court approval. The Court has broad discretion to grant approval and should do so where the proposed settlement is "fair, adequate, reasonable, and not a product of collusion." *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1026 (9th Cir. 1998); *Joel A. v. Giuliani*, 218 F.3d 132, 138 (2d Cir. 2000). In determining whether a settlement should be approved, the Ninth Circuit has a "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned." *In re Heritage Bond Litigation*, 2005 U.S. Dist. LEXIS 13555, *9 (C.D. Cal. June 10, 2005) (*citing Class Plaintiffs v. Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992)).

Approval of a class action settlement involves a two-step process. In determining whether to grant final approval of the settlement, a court examines the terms for overall fairness and, in so doing, balances the following factors: the strength of the plaintiff's case; the risk, expense, complexity and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed; the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and, the reaction of the class members to the proposed settlement. *Hanlon*, 150 F.3d at 1026.

Here, the proposed settlement was reached after undertaking a robust factual and legal investigation into the claims and defenses in this lawsuit. This robust factual and legal investigation led to Plaintiffs filing a motion for class certification and the Court granting this motion. It was only after significant post-certification discovery was conducted that the Parties reached an agreement to settle. The settlement amount takes into consideration the risks of

Plaintiffs' prevailing on the employment relationship, the risks on the merits of Plaintiffs' underlying claims, and the risks in maintaining class certification through trial. In light of these risks, the settlement amount is well within the ballpark of reasonableness.

**1.  The Settlement was a Result of Arm's-Length Negotiations**

The Ninth Circuit has shown longstanding support of settlements reached through arm's length negotiation by capable opponents. In *Rodriguez v. West Publishing Corp.*, 563 F.3d 948 (9th Cir. 2009), the Ninth Circuit expressly opined that courts should defer to the "private consensual decision of the [settling] parties." *Id.* at 965, citing *Hanlon*, 150 F.3d at 1027. Here, the proposed settlement is the product of arm's-length negotiations facilitated by Mr. Ross, one of the most respected mediators in wage and hour class actions. This settlement was reached with the assistance of Mr. Ross after arms-length bargaining by the Parties at a formal mediation scheduled on November 4, 2021, and extensive subsequent conversations.

**2.  *In re Bluetooth* Factors are not Present Here**

In *Bluetooth,* the Ninth Circuit articulated additional factors that need to be considered. *In re Bluetooth Headset Products Liability Litigation* ("*Bluetooth*"), 654 F.3d 935, 946 (9th Cir. 2011). The *Bluetooth* factors are met here.

The three signs *Bluetooth* instructs trial courts to look for are:

1. When class counsel receives a disproportionate distribution of the settlement, or when the class receives no monetary distribution but counsel is amply rewarded;
2. When the parties negotiate a 'clear sailing' arrangement providing for the payment of attorney's fees separate and apart from class funds without objection by defendant;
3. When the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund.

*Id* at 947.

This settlement passes the *Bluetooth* test. The NSA is over two and a half times larger than the fees requested by Class Counsel, which is the accepted federal benchmark of 25% of the GSA. Additionally, any amount requested by Class Counsel and not awarded by the Court shall become part of the NSA and distributed to Class Participants. (*See* Exhibit 1 at Section III, Paragraph 2, Page 11). There is also no "clear sailing" provision for attorneys' fees in the Joint

Stipulation. (*Id.*). Accordingly, unlike the settlement agreement in *Bluetooth,* the instant settlement cannot be said to arouse suspicion of collusion.

### 3. The Settlement is Fair

When evaluating the settlement terms for purposes of ruling on whether to finally approve it, the Court is to review the strength of a plaintiff's case, including "the probable outcome of a trial on the merits of liability and damages as to the claims, issues, or defenses of the class and individual class members." *Van Ba Ma v. Covidien Holding, Inc.*, 2014 U.S. Dist. LEXIS 76359, *6-7 (C.D. Cal. 2014) (*citing Marshall v. Holiday Magic, Inc.*, 550 F.2d 1173 (9th Cir. 1977)). In ruling on final approval, the "fairness hearing is not to be turned into a trial or a rehearsal for trial on the merits." *Id.* (*quoting Officers for Justice v. Civil Serv. Comm'n of the City and Cnty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982)).

There is no standard or benchmark for determining whether a settlement is fair. "Ultimately the district court's determination is nothing more than 'an amalgam of delicate balancing, gross approximations and rough justice.'" *Officers for Justice v. Civil Service Comm. of City and County of San Francisco*, 688 F. 2d 615, 625 (9th Cir. 1982). A court should weigh the benefits that the settlement will realize for the class against the uncertainty of litigation and the possibility that the class members would obtain no relief in the absence of a settlement. *See Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998) ("...it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements."); *see also Hanlon*, 150 F.3d at 1026 (when considering the fairness of a proposed class settlement, courts consider the strength of a plaintiff's case against the risk, expense, complexity and likely duration of further litigation.).

### A. All of Plaintiffs' Claims Revolve Around Whether They were Misclassified as Independent Contractors

#### i. Employment Status

Plaintiffs, and the certified Class, are truck drivers who contracted with and drove for URS during the Class Period. Each of the Class Members was classified by URS as an independent contractor. The core question in the case is whether URS correctly classified the drivers as

independent contractors. Plaintiffs assert that URS's classification was in error, and that the drivers were URS's employees under California law. As such, all the claims alleged in this matter are based on URS's failure to classify Class Members as employees. Put differently, if Plaintiffs lose on this single issue, they will take nothing from this matter. (Mara Dec. ¶ 19).

In its Order Granting Plaintiffs' Motion for Class Certification, the Court indicated that the multi-factored, "right-to-control" employment test articulated by the California Supreme Court in *S.G. Borello & Sons, Inc. v. Department of Industrial Relations* ("*Borello*") 48 Cal.3d 341 (1989) would control the outcome of whether the class were employees or independent contractors. (*See* ECF No. 53 at fn 4 ("Because none of Plaintiffs' claims are grounded in the state wage orders, the ABC Test does not apply to their claims and the Court does not evaluate the predominance question under the ABC test.")). (Mara Dec. ¶ 20).

Based on deposition testimony and documents produced in this matter, Plaintiffs contend that URS substantially controls Class Members, and that Plaintiffs would be able to provide evidence to meet the factors delineated in the *Borello* employment test to show that Class Members should have been classified as employees. URS vehemently denies these contentions. (Mara Dec. ¶ 21).

### ii. Plaintiffs' Underlying Claims

Plaintiffs assert that URS misclassified Class Members as independent contractors, and, therefore, that Class Members were entitled to protections under the California Labor Code that they were not afforded while working with URS. For example, under the contracts Class Members signed with URS, Class Members were responsible for paying business expenses such as fuel, maintenance, and insurance, that they would not have been responsible for if they were employees. In addition, they had to use their personal cell phones in the performance of their work duties. Under California Labor Code § 2802, employees must be reimbursed for necessary business expenses. Plaintiffs contend that Class Members should have been classified as employees and, thus, should have been reimbursed for these business expenses. (Mara Dec. ¶ 22).

Plaintiffs also assert that due to their alleged misclassification, they were not provided with meal periods, rest periods, itemized wage statements and waiting time penalties that were

owed to them under California law. Plaintiffs further assert that the contracts they operated under only paid them for the time they were driving and did not pay them for the time they were performing non-driving tasks such as pre-trip and post-trip inspections. (Mara Dec. ¶ 23).

### iii. The Claims Faced Many Formidable Obstacles that, if not Overcome, Would Result in the Class Taking Nothing or Very Little

#### 1. Establishing the Employment Relationship

Class Members can only recover if they are successful in showing URS misclassified them as independent contractors, rather than employees. In other words, Class Members must show they were employees to recover anything. If they fail to show that threshold issue, no matter how strong their claims are against URS, the Class will recover nothing. Thus, any risk analysis associated with the claims must start foundationally with the existing dangers that could prevent the Class Members from proving they are employees, rather than independent contractors. (Mara Dec. ¶ 24).

The test that will determine whether the Class of drivers are employees of URS is the right-to-control test articulated by the California Supreme Court, in *Borello*. To be employees under that test, URS must be found to possess "the right to control the manner and means of accomplishing the result desired." *Ayala v. Antelope Valley Newspapers, Inc.* 59 Cal.4th 522, 532 (2014). Courts also must look at secondary factors under the *Borello* test in the determination of whether the Class of drivers are employees. These secondary factors include:

> (a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee.

*Borello*, 48 Cal. 3d at 351. (Mara Dec. ¶ 25).

Under the facts, Plaintiffs believe URS controls nearly every aspect of their work of hauling cars and, at a minimum, "retains all *necessary* control" over the drivers. *Borello*, 48 Cal.3d at 357 (emphasis in original). For instance, through the contracts, referred to as

Independent Contractor Service Agreements ("ICSAs"), URS requires drivers to "full comply with all operating procedures of [URS] and all reasonable specifications of the shipper," maintain equipment up to URS's standards and in accordance with URS's inspection program, and report to dispatch at various points during hauls. (Mara Dec. ¶ 26).

Despite this confidence, two very real obstacles stand in the way of the Class successfully being found to be employees. One, the Ninth Circuit, in *Bowerman v. Field Asset Services, Inc.*, 60 F.4th 459 (9th Cir. 2023)[13], recently issued a ruling that made it substantially more difficult to be found an employee under *Borello*. Two, an employment relationship cannot be established on the basis of mandates and policies that are implemented to comply with federal regulations. (Mara Dec. ¶ 27).

In *Bowerman*, the Ninth Circuit reversed the district court's finding that class members were employees. Although the district court held that "[n]o reasonable juror could review the Vendor Packets, the work orders, the trainings, the Vendor Profiles, the discipline, and the Vendor scorecards, and conclude [that] any of the Vendors are independent contractors[,]"[14] the Ninth Circuit rejected that holding, arguing that not all controls are treated equally under the *Borello* test.

Specifically, the Ninth Circuit reasoned that "if control may be exercised only as to the result of the work and not the means by which it is accomplished, an independent contractor relationship is established." *Bowerman*, 60 F.4th at 474. The Ninth Circuit found that all the facts on which the *Bowerman* plaintiffs relied to establish an employment relationship under *Borello* could reasonably be interpreted as controlling the results of the work. *Id.* at 474-476. The Ninth Circuit also found that many of *Borello*'s secondary factors "tip in favor of independent contractor status." *Id.* at 476. Specifically, the Ninth Circuit ruled that "the parties intent to create an independent contractor relationship, the class members' opportunity for profit or loss, the class members' employment of assistants" tended to show an independent contractor relationship. *Id.*

---

[13] This opinion was initially issued on July 5, 2022 at 39 F.4th 652. Rehearing *En Banc* was requested and denied. The reviewing Panel, however, ordered the decision amended. Thus, the 2023 decision as cited above is the amended version of the original decision.
[14] *Bowerman,* 60 F.4th at 466.

(Mara Dec. ¶ 28).

Under *Bowerman*, this Court or a jury could find that many of the controls Plaintiffs rely on go to controlling the results of the timely delivery of cars for URS' customers. Additionally, like *Bowerman*, URS drivers have the ability to hire assistants to perform their work under the ICSA. Indeed, one of the named class representatives in this matter hired numerous drivers to perform work under his ICSAs with URS. Thus, like *Bowerman*, this Court or jury could find that this "tips in favor of" an independent contractor relationship. (Mara Dec. ¶ 29).

Although counsel for Plaintiffs believe *Bowerman* is at odds with other Ninth Circuit cases and is distinguishable on certain grounds, it remains binding precedent and counsel does not know how this Court or a jury will apply *Bowerman*. In addition, even if this Court were to rule in Plaintiffs' favor and find for employment status, like the district court in *Bowerman*, that decision could be similarly overturned by the Appeals Court. The danger of losing on this issue cannot be understated. If the employment status issue is lost, the Class takes nothing. (Mara Dec. ¶ 30).

Even if Plaintiffs prevail over *Bowerman*, "[a] putative employer does not exercise any degree of control merely by imposing requirements mandated by government regulation." *Linton v. DeSoto Cab Co., Inc.* 15 Cal. App. 5th 1208, 1223 (2017). The contractual relationship between URS and the Class Members is governed by the federal motor carrier leasing regulations, which set forth the requirements for a written lease between the owners/lessors of motor vehicle equipment (in this case, the Class Members) and the lessees of that equipment (in this case, URS). (Mara Dec. ¶ 31).

Accordingly, URS asserts that any policies it has that cover independent contractors are in place to meet these requirements. Significantly, one of these requirements is found in 49 C.F.R. § 385.5. Under 49 C.F.R. § 385.5, **"[t]o meet the safety fitness standard, the motor carrier must demonstrate it has adequate safety management controls in place, which function effectively to ensure acceptable compliance with applicable safety requirements[.]"** (Emphasis added). URS argues that the policies Plaintiffs rely on to establish an employment relationship are in place to meet this broad regulation. Put differently, if the policies and practices Plaintiffs rely on as supporting an employment relationship are found to be an offshoot of URS's

federal mandate that it maintain "adequate safety management controls," they cannot establish an employment relationship and the Class would take nothing. (Mara Dec. ¶ 32).

Although Counsel for Plaintiffs believes that URS' policies and rights to control go beyond simply trying to comply with federal safety mandates or other federal regulations, some of the "control" facts are safety-oriented, such as accident reporting, maintaining the equipment according to URS' specifications, and load securement. With the potential exclusion of some, many, or all facts related to URS' control from the employment question under *Borello*, the probability of losing on the employment issue increases. Given that a loss on that issue would result in the Class taking nothing from this action, considerable weight had to be given to it in evaluating settlement. (Mara Dec. ¶ 33).

## 2. Risks on the Merits of Plaintiffs' Underlying Claims

Although prevailing on the employment issue is a necessary predicate to obtaining any money here, success on the issue does not guarantee the Class will recover anything. It just gets them to the next step: showing URS violated Labor Code section 2802 by failing to reimburse Class Members for costs such as insurance, fuel, maintenance, and damage claims and violated California's minimum wage laws. As the following shows, many real and considerable obstacles threaten the success of these underlying claims. (Mara Dec. ¶ 34).

### a. The Claims Under California Labor Code § 2802 Faced Real and Considerable Risks

#### i. Three out of Five Cases that have Ruled on the Issue in the Ninth Circuit and California Have Found that Labor Code § 2802 is Preempted by the Truth-in-Leasing Regulations for all but Cell Phone Reimbursements

URS has indicated that it intends to file a motion for summary judgment of Plaintiffs' Business Expense Reimbursement claims under Labor Code § 2802 on the grounds that the claims are preempted under the federal Truth-in-Leasing regulations. Specifically, URS was going to argue that all but Plaintiffs' claims for cell phone reimbursements are preempted and must be dismissed. If successful, this argument would have absolutely gutted the value of the most substantial claims in this case. Despite firmly believing the claims are not preempted, Plaintiffs

must deal with the unfortunate and very real fact that three out of five cases in the ninth circuit and California to deal with the issue have found in favor of preemption. (Mara Dec. ¶ 35).

For example, in *Valdez v. CSX Intermodal Terminals, Inc.*, the Northern District of California found that expenses associated with acquiring and/or maintaining vehicles, fuel, maintenance, insurance, and cargo and property damage are preempted under the federal Truth-in-Leasing regulations:

> Defendant contends that Plaintiffs' Section 2802 reimbursement claims are preempted by 49 C.F.R. Section 376.12(d), (e), (i), and (j). Defendant is largely correct. Plaintiffs cannot seek reimbursement for the expenses associated with acquiring and/or maintaining vehicles because these claims are preempted by 49 C.F.R. Sections 376.12(c)(1) and (d), which expressly contemplate that carriers and drivers will enter leases whereby the drivers provide their vehicles to the carriers. . . .
>
> In addition, Plaintiffs cannot seek reimbursement for fuel and maintenance because these claims are preempted by 49 C.F.R. Section 376.12(e), which expressly permits carriers and drivers to enter leases that allocate these expenses to the drivers. . . . Similarly, Plaintiffs' claims for insurance reimbursements are preempted by 49 C.F.R. Section 376.12(j)(1). . . .
>
> Plaintiffs' claim for cargo and property damage is preempted by 49 C.F.R. Section 376.12(j)(3), which permits leases to specify conditions under which deductions for such damage may be made from the driver's settlements. Plaintiffs' claim for escrow funds is preempted by 49 C.F.R. Section 376.12(k), which permits leases to provide for escrow funds.

*Valdez v. CSX Intermodal Terminals, Inc.*, 15-cv-05433, 2017 U.S. Dist. LEXIS 66923 *1, *25-*26 (N.D. Cal. April 10, 2017). The only expenses that *Valdez* found not to be preempted were expenses for drivers' use of their personal cell phones. *Id.* at *26-*27.

As the Northern District did in *Valdez*, the Central District of California found preemption in *Salter v. Quality Carriers*, 20-cv-479, 2021 U.S. Dist. LEXIS 213111 *1, *34-*35 (C.D. Cal. Oct. 27, 2021) ([B]ecause the [Truth-in-Leasing] regulations expressly provide the parties the freedom to contract to allocate certain operational costs to contractors and to deduct those costs from the contractors' compensation, the Court concludes that Plaintiff's claim for unreimbursed business expenses under California Labor Code § 2802 and allegedly illegal deductions under California Labor Code § 221 are preempted."). Also, in the California Court of Appeal in *Rodriguez v. RWA Trucking Co., Inc.*, 238 Cal.App.4th 1375, 1393 (2013), found that insurance

1    expenses were preempted.[15]

2         Only two Ninth Circuit District Courts have ruled against preemption - *Goyal v. CSX*

3    *Intermodal Terminals, Inc.*. 17-cv-06081, 2018 U.S. Dist. LEXIS 164643 *1 (N.D. Cal. Sept. 25,

4    2018) and *Henry v. Cent. Freight Lines, Inc.*, 2019 U.S. Dist. LEXIS 99594 *1, *15 (E.D. Cal.

5    June 13, 2019). Plaintiffs contend that the reasoning in *Goyal* is more persuasive than the cases

6    relied upon by URS. However, given the fact that a majority of courts faced with the issue have

7    ruled against the Plaintiffs' interest, a considerable amount of weight had to be given to the

8    prospect that Plaintiffs here would similarly succumb to a preemption argument on their most

9    valuable expense reimbursement claims. (Mara Dec. ¶ 36).

10                            **ii.    URS Argues that It Pays Class Members**
                                    **an Enhanced Compensation to Cover**
11                                  **Business Expenses**

12         Alternatively, URS argues that it pays Class Members enhanced compensation to cover

13   business expenses. URS relies on the case *Gattuso v. Harte-Hanks Shoppers, Inc.*, 42 Cal. 4th

14   554 (2017). (Mara Dec. ¶ 37). In *Gattuso*, the California Supreme Court held that an employer

15   may satisfy its obligation under California Labor Code § 2802 by paying employees enhanced

16   compensation in the form of increases in base pay or commission rates. In doing so, an employer

17   must show two things: (1) the employer must establish "some method or means to apportion the

18   enhanced compensation to identify what portion is intended as expense reimbursement," and (2)

19   it must show the identified reimbursement amounts are enough to cover expenses incurred. *Id.* at

20   575. URS argues that it pays Class Members an enhanced compensation and that it details on

21   settlement sheets the amounts for compensation and the amounts of expenses.

22         Plaintiffs disagree that URS pays Class Members an enhanced compensation and rely on

23   *Espejo v. The Copley Press, Inc.*, 13 Cal. App. 5th 329, 367 (2017). Plaintiffs argue that URS'

24   compensation is not the same as in *Gattuso* because URS deducts amounts for costs before they

25   pay the compensation and there is no way for drivers to identify what amount is being paid for

26

27   _____
     [15] See also *Remington v. J.B. Hunt Transp., Inc.*, 15-cv-100100, 2016 U.S. Dist. LEXIS 126487
28   *1, *5 (D. Mass Sept. 16, 2016) (finding that that Truth-in-Leasing regulations preempted the
     plaintiffs' complaint alleging improper deductions).

labor performed and the amount being paid as reimbursement for business expenses. *See Id.* at 366-367. (Mara Dec. ¶ 38). However, there is a very real risk that the Court would agree with URS on this issue.

Again, if Plaintiffs had lost on this issue, their most valuable claim would have been gutted. (Mara Dec. ¶ 39).

> **b. If the ICSAs can be Read to Compensate for All Transportation-Related Services, They Will Compensate for Driving and Non-Driving and Plaintiffs' Claims for Minimum Wage Violations Would Fail**

Plaintiffs claim the ICSAs fail to pay for non-driving time and only pay for the actual hauling of cars. Thus, Plaintiffs argue that when they are not driving, the ICSAs pay them nothing, which violates California's minimum wage laws. Whether any compensation is owed to employees is a matter determined primarily by contract, which, here, would be the ICSAs. *Oman v. Delta Airlines, Inc.* 9 Cal.5th 762, 782. (Mara Dec. ¶ 40).

In opposing this claim, URS relies on *Salter v. Quality Carriers*, 20-cv-479, 2021 U.S. Dist. LEXIS 213111 *1 (C.D. Cal. Oct. 27, 2021). In *Salter*, the Central District of California granted summary judgment in the employer's favor of the plaintiff's cause of action for failure to pay minimum wage. *Id.* at *30-*32. There, the parties entered into an agreement that outlined the compensation to be paid. The agreement set forth compensation that the plaintiff would receive for services which were defined to include "transport, load, unload, and perform other transportation-related services." *Id.* at *30. The plaintiff earned an adjusted gross revenue for each load tendered to him. *Id.* The *Salter* court found that the plaintiff understood that his compensation pursuant to the parties' agreement "was for 'transportation-related services,' which included tasks beyond merely driving his truck from one location to another." *Id.* at *32. (Mara Dec. ¶ 41).

Here, if the ICSAs can be read to compensate for transportation related services, then, as in *Salter,* they would compensate for all tasks, including non-driving time, associated with transporting. Therefore, considerable deference had to be paid to the fact this Court or a jury could find the ICSAs did not contemplate compensation of specific acts – i.e., driving – but paid for

everything, which would result in Class Members taking nothing for their minimum wage claims. (Mara Dec. ¶ 42).

> **c. The Ninth Circuit has Ruled the FMCSA Decision and Order Preempts the Enforcement of California Meal and Rest Period Claims – a Conclusion this Court Applied Earlier in this Case in Dismissing Meal and Rest Period Claims**

Early in the case, this Court granted URS' motion to dismiss Plaintiffs Sales' and Clemons' claims for meal and rest periods with prejudice pursuant to the FMCSA's December 28, 2018, Decision and Order. In that Decision and Order, the FMCSA ordered that California's meal and rest period claims were preempted. The Ninth Circuit ruled that the agency did not exceed its authority in issuing the decision. *Int'l Bhd. Of Teamsters, Local 2785 v. Fed. Motor Carrier Safety Administration*, 986 F.3d 841, 846 (9th Cir. 2021). ("Because the agency's decision reflects a permissible interpretation of the Motor Carrier Safety Act of 1984 and is not arbitrary or capricious, we deny the petitions for review."). (Mara Dec. ¶ 43).

The Ninth Circuit, however, left open the question of whether that Decision and Order of the FMCSA could apply to claims retroactive to its issuance date of December 28, 2018. The Ninth Circuit subsequently answered that question in the affirmative, in *Valiente v. Swift Transportation Co. of Arizona, LLC*, 54 F.4th 581, 587 (9th Cir. 2022). (Finding "Congress and the FMCSA have spoken with a clear voice in prohibiting enforcement of California's MRB rules[, and] [a]llowing Plaintiffs to move forward with their claims would require this Court to act in opposition to that decree."). Thus, the meal and rest period claims are not part of the class certification order here and the only potential value of meal and rest period claims lies in the remote and totally unknowable prospect that the agency may reverse course at some point. There is no evidence the agency is going to change its opinion. (Mara Dec. ¶ 44).

> **3. Risks to Plaintiffs' Wage Statement and Waiting Time Penalties Claims**

As to the waiting time penalties claims, URS argues that Plaintiffs would not be able to prove that URS "willfully" failed to pay Class Members the appropriate wages due upon separation of employment. "A willful failure to pay wages within the meaning of Labor Code

Section 203 occurs when an employer intentionally fails to pay wages to an employee when those wages are due. However, a good faith dispute that any wages are due will preclude imposition of waiting time penalties under Section 203." Cal. Code Regs. Tit. 8 § 13520. "A 'good faith dispute' that any wages are due occurs when an employer presents a defense, based in law or fact, which would preclude any recovery on the part of the employee. The fact that a defense is ultimately unsuccessful will not preclude a finding that a good faith dispute did exist." *Id.* (Mara Dec. ¶ 45).

URS contends that any failure to pay wages due at the separate of employment was not willful. URS argues that it would not be liable for waiting time penalties because a "good faith dispute" exists over the payment of those wages. *See* Cal. Code Regs. Tit. 8 § 13520; *Amaral v. Cintas Corp. No. 2* (2008) 163 Cal.App.4th 1157, 1201. (Mara Dec. ¶ 46).

As to Plaintiffs' wage statement claim, URS asserts that any violation of California Labor Code § 226 was not "knowing and intentional." *See* Cal. Lab. Code § 226(e) ("An employee suffering injury as a result of a ***knowing and intentional*** failure by an employer" may recover damages") (emphasis added); *Amaral v. Cintas Corp. No.* 2, 163 Cal.App.4th 1157, 1195 (2008) ("Some statutory penalties are imposed only if an employers' violation was 'willful' or 'knowing.' . . . [S]*ection 226, subdivision (e)* penalizes an employer's 'knowing and intentional' failure to provide itemized wage statements under *section 226, subdivision (a)*[.]"). URS also contends that employees cannot show that they have suffered an injury because of any potential violation of California Labor Code § 226. (Mara Dec. ¶ 47).

It should be noted that the waiting time penalties claim is derivative of the meal period, rest period, and unpaid wages claims. As such, if those claims fail, the waiting time penalties claim would also be extinguished. (Mara Dec. ¶ 48).

#### 4.  Risks to Plaintiffs' PAGA Claim

Plaintiffs' PAGA claims are based upon the same underlying conduct as Plaintiffs' class claims. As such, they are subject to the same risks of establishing employment status and the underlying claims are subject to the same risks on the merits. (Mara Dec. ¶ 49).

In addition, there is the risk that the Court would reduce the maximum penalty amount, if established. Section 2699, subdivision (e)(2) provides that "[i]n any action by an aggrieved

employee seeking recovery of a civil penalty available under subdivision (a) or (f), a court may award a lesser amount than the maximum penalty amount specified by this part if, based on the facts and circumstances of the particular case, to do otherwise would result in an award that is unjust, arbitrary, oppressive, or confiscatory." In *Thurman v. Bayshore Transit Management, Inc*., the court found that penalties may be reduced when a defendant has taken its obligations to comply with the law seriously. *Thurman v. Bayshore Transit Management, Inc*., 203 Cal. App. 4th 1112, 1135-1136 (2012). URS argues that if the case were to continue in litigation, it would be able to show that it took its obligations to comply with the law seriously. As such, if Plaintiffs were able to prevail on the merits of their PAGA claims, the Court may reduce the maximum penalty amount. (Mara Dec. ¶ 50).

As noted, Plaintiffs' PAGA claims are based on the same alleged unlawful conduct as their class claims. Because of this, the likelihood of the Court reducing the PAGA penalties awarded to Plaintiffs and the Aggrieved Individuals – assuming liability is proven as to each of Plaintiffs' claims – is higher in this case where Class Members would be receiving damages for the same conduct under both the class claims and the PAGA claims. URS argues that this would be an unjust double recovery and would lead the Court to reducing any PAGA penalty amount. (Mara Dec. ¶ 51).

### 5. Maintaining Certification

Should litigation continue, there is also the risk that Plaintiffs may not be able to maintain certification of the Class or of a subset of Class Members. Specifically, URS argues that if litigation were to continue, it would move to decertify a subset of the Class Members that used assistant drivers. URS contends that decertification is proper because some Class Members used assistant drivers and Plaintiffs will not be able to show class-wide data reflecting which routes were driven by a Class Member and which were driven by a secondary driver utilized by a Class Member. This is important because, if there is no way to determine who drove each load there is no way to determine who incurred damages, i.e., who incurred expenses or who incurred wage loss. (Mara Dec. ¶ 52).

URS contends that to try to determine who was injured would prove unmanageable. URS

relies on the rationale in the case *Villapando v. Excel Direct*. *See Villalpando v. Exel Direct Inc.*, 12-cv-04137, 161 F. Supp. 3d 873 (N.D. Cal. May 20, 2016). In *Villapando*, the Northern District decertified a portion of a certified class for similar reasons that URS presents here. The court in *Villapando* decertified class members who utilized secondary drivers as to all damages. *Id.* at 880. The *Villapando* court found that class members who used secondary drivers could not recover damages for hours worked, miles driven, and expenses incurred by secondary drivers. *Id.* at 881. The *Villapando* court found that the challenge occurred in determining as to these class members what proportion of the driving was personally performed by the class member and what portion of the driving was done by assistant drivers. *Id.* On this basis, the *Villapando* court found that in determining damages for these class members, individual issues overwhelmed common ones and decertification was proper. *Id.* 881-882. (Mara Dec. ¶ 53).

For these reasons, while the Court has already granted class certification, Plaintiffs would face challenges in maintaining that certification through trial. (Mara Dec. ¶ 54).

## VI.   SUFFICIENT DISCOVERY AND INVESTIGATION HAS OCCURRED

Class Counsel conducted a thorough investigation into the facts of this lawsuit. Class Counsel have engaged in substantial investigation and discovery to assess the relative merits of the claims and URS's defenses to them. The discovery, investigation, and litigation process has been adequate to give Class Counsel a sound understanding of the value, strength, and vulnerabilities of the Class's claims.

Specifically, Class Counsel has conducted discovery and an investigation into the claims during the prosecution of this action. This discovery, investigation, and prosecution has included, among other things, (a) holding multiple meetings with Plaintiffs and Class Members; (b) serving substantial discovery on URS, including Class-wide discovery; (c) inspecting and analyzing documents and data produced by Plaintiff Clemons and Plaintiff Sales, Class Members, and URS; (d) analyzing the legal positions taken by URS and the developments in the law related to various claims; (e) defending class representative depositions and the depositions of three Class Members; (f) deposing URS's Rule 30(b)(6) designee; (g) engaging in briefing on the motion to dismiss; (h) prevailing on a contested motion for class certification; (i) communicating and

holding meetings with Class Members; (j) analyzing potential damages before and throughout the settlement negotiation process; (k) researching the applicable law with respect to the Class's claims and URS' potential defenses; and (l) assessing the risk of further litigation. (Mara Dec. ¶ 16).

After conducting an analysis of the materials URS produced, Class Counsel also drew on their extensive experience in similar cases to assess the strengths and weaknesses of Plaintiffs' claims. This discovery allowed Class Counsel to assess the merits and value of Plaintiffs' claims and defenses thereto, if a settlement was not reached. Based on their review and independent investigation into the facts and claims asserted in this matter, Class Counsel believe that this settlement is fair, reasonable, and adequate and is in the best interest of the class. (Mara Decl. ¶ 17).

## VII. CLASS COUNSEL HAVE EXTENSIVE EXPERIENCE ACTING AS CLASS COUNSEL

As set forth in Plaintiffs' Motion for Attorneys' Fees, Costs, and Class Representative Enhancement Payment (ECF No. 122), Class Counsel's experience in complex class action matters is extensive. Class Counsel have prosecuted numerous cases on behalf of employees for California Labor Code violations and thus are experienced and qualified to evaluate the class claims present in this case, and the defenses thereto, and to evaluate settlement versus trial on a fully informed basis. This experience instructed Class Counsel on the risks and uncertainties of further litigation and guided their determination to endorse the proposed settlement.

## VIII. THE CLASS MEMBERS' RESPONSE TO THE SETTLEMENT IS FURTHER EVIDENCE THAT THE SETTLEMENT IS FAIR AND REASONABLE

The Ninth Circuit has held that the number of class members who object to a proposed settlement is a factor to be considered in determining a settlement's fairness. *Mandujano v. Basic Vegetable Products, Inc.*, 541 F. 2d 832, 837 (9th Cir. 1976). Here, 91% of the Class did not object to the settlement. In addition, no Class Members requested to be excluded from the settlement, resulting in a 100% participation rate in the settlement. The fact that an overwhelming majority of the Class Members support the settlement and the fact that there were no requests for exclusion evidences the Class Members' endorsement of this non-reversionary settlement.

## IX. THE COURT SHOULD APPROVE THE SETTLEMENT ADMINISTRATION FEE

The Parties agreed to hire Phoenix as the Settlement Administrator, a choice the Court approved in conjunction with granting preliminary approval. Phoenix was responsible for mailing and emailing the Class Notice to Class Members, obtaining better addresses for undeliverable Class Notices, responding to Class Member inquiries, providing weekly status reports to all counsel, receiving communications from the Class Members, and providing a declaration documenting its duties and responsibilities in administering the Class Notice. Following the grant of final approval, Phoenix will continue to calculate the payments to Class Participants, send the individual settlement shares to Class Participants, distribute other payments ordered by the Court, and perform such other duties as described in the Joint Stipulation. Phoenix's fee of $11,000 for services rendered and to be rendered is fair and reasonable and should be granted.

At preliminary approval, Phoenix's fee was $9,000. Although this fee increased due to additions to Phoenix's original quote,[16] Phoenix's fee is still lower than the two competing bids received from other administration companies. Prior to preliminary approval, Class Counsel requested quotes from three administration companies: Phoenix; ILYM Group, Inc.; and Simpluris. ILYM Group, Inc.'s quote for the administration process was $29,000 and Simpluris' quote for the settlement administration process was $12,000. As such, Phoenix's fee of $11,000 is still the lowest administration cost and should be granted.

## X. THE COURT SHOULD APPROVE THE PAGA PAYMENT TO THE LWDA

The payment of $94,743.75 (75% of $126,325) to the LWDA for its share of the applicable penalties claimed under PAGA, is reasonable under the circumstances. The Parties negotiated a good faith amount to the LWDA. The sum to be paid to the LWDA was not the result of self-interest at the expense of other Class Members. The LWDA was provided notice of the settlement concurrently with the filing of the preliminary approval motion and the instant motion. Plaintiffs did not receive a response or objection to the settlement from the LWDA. (Mara Decl. ¶ 56). Thus, Plaintiffs respectfully requests the Court finally approve the sum of $94,743.75 for payment

---

[16] Phoenix's original quote did not take into account a Spanish translation or emailing of the Class Notices.

to the LWDA.

**XI. CONCLUSION**

      Based on the foregoing, Plaintiffs respectfully request that the Court find the settlement is fair, reasonable, and adequate and grant final approval of the settlement. Plaintiffs further request the Court approve the requested settlement administration fee and PAGA payment. Last, Plaintiffs respectfully request the Court enter final judgment in this matter.


Dated: February 8, 2024              **MARA LAW FIRM, PC**

                                           */s/ David Mara*
                                           David Mara, Esq.
                                           Jill Vecchi, Esq.
                                           Representing the Class


Dated: February 8, 2024              **HUNTER PYLE LAW**

                                           */s/ Hunter Pyle*
                                           Hunter Pyle, Esq.
                                           Andrea A. Núñez, Esq.
                                           Representing the Class